**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Joseph Dorsey, | No. CV-19-0302-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew Saul, Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 20). Defendant filed his Answering Brief ("Response") (Doc. 21), and Plaintiff filed his Reply (Doc. 22). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.    BACKGROUND

### A.    *Procedural History*

On July 20, 2013, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of April 23, 2013 due to degenerative disc disease, obesity, cervical radiculopathy, hypertension, neuropathy, and carpal tunnel syndrome. *See* Administrative Record ("AR") at 26, 29, 34, 141–42, 172, 193–95, 199–200, 205, 213, 215, 368, 394, 405, 408, 427, 436. The Social Security

Administration ("SSA") denied this application on October 2, 2013.  *Id.* at 193–98, 213, 231–34.  On November 6, 2013, Plaintiff filed a request for reconsideration, and on April 14, 2014, SSA denied Plaintiff's application upon reconsideration.  *Id*. at 199–209, 213, 235–38.  On May 28, 2014, Plaintiff filed his request for hearing.  *Id.* at 213, 239–40.  On September 3, 2015, a hearing was held before Administrative Law Judge ("ALJ") Laura Speck Havens.  *Id.* at 25, 168–92, 213.   On October 29, 2015, the ALJ issued an unfavorable decision.  AR at 213–20.  On December 21, 2015, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on February 14, 2017, the Appeals Council remanded the matter to the ALJ.  *Id.* at 225–29, 298–300.

On July 27, 2017, a second hearing was held before the ALJ.  *Id.* at 137–67.  On January 17, 2018, the ALJ again issued an unfavorable decision.  *Id.* at 22–35.  On March 12, 2018, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on May 6, 2019, review was denied.  *Id.* at 1–6, 15–16.  On June 7, 2019, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.    Factual History

Plaintiff was sixty-one (61) years old at the time of the first administrative hearing, sixty-two (62) at the time of the second administrative hearing, and fifty-eight (58) at the time of the alleged onset of his disability.  AR at 26, 142, 171–72, 193–95, 199–200, 205, 285, 349, 353, 368, 394, 405, 427, 436.   Plaintiff obtained a high school diploma and attended approximately one (1) year of college.  *Id.* at 142, 193, 199, 406, 640.  Prior to his alleged disability, Plaintiff worked as a hardware store manager.  *Id.* at 142, 175, 397, 406.

### 1.  Plaintiff's Testimony

#### a.  Administrative Hearing

##### i.  *September 3, 2015*

At the first administrative hearing, Plaintiff testified that his alleged onset of disability was April 23, 2013.  AR at 172.  Plaintiff further testified that he had a seizure at work and his son drove him to the emergency room.  *Id.*  Plaintiff testified that he was technically terminated following his health incident, and then filed for and received

unemployment benefits.  *Id.* at 173.  Plaintiff indicated that he was still seeking work-from-home employment because he could not work a full eight (8) hour day.  *Id.* at 174–75.  Plaintiff confirmed that he suffers from migraine headaches, sleep apnea, and neuropathy, and noted that he had also gained seventy (70) pounds.  *Id.* at 175.

Plaintiff described his prior work was as a hardware manager, and also confirmed that he currently lives in a house with his wife.  AR at 175–77.  Plaintiff testified that he is able to attend to his personal hygiene and shares the household chores with his wife, including cooking, washing dishes, mopping or sweeping, doing laundry, and grocery shopping.  *Id.* at 176.  Plaintiff indicated that he can do some yardwork, but mostly directs his grandchildren in performing the outdoor tasks.  *Id.* at 176–77.  Plaintiff testified that he enjoys woodworking, but hasn't really done it for approximately two (2) years.  *Id.* at 177.  Plaintiff further testified that he watches some television for approximately four (4) hours per day after his wife comes home from work.  *Id.* at 177–78.  Plaintiff denied getting regular exercise, although he acknowledged trying to do some home exercises that he was given at physical therapy to minimize his pain.  AR at 178.  Plaintiff estimated that he was on the computer for approximately one-half to one (1) hour daily to check e-mail and job postings.  *Id.* at 178–79.

Plaintiff confirmed that he has a driver's license and the longest he can drive is approximately forty-five (45) minutes.  *Id.* at 179.  Plaintiff testified that he has trouble sleeping, waking up every two (2) or three (3) hours at night, getting a total of four (4) to six (6) hours of sleep per night, but then needs to take a two (2) hour nap during the day.  *Id.* at 179, 186–87.  Plaintiff confirmed his current medications include Hydrochlorothiazide, Losartan, Gabapentin, Atenolol, Cyclobenzaprine, Magnesium, and Hydrocodone.  *Id.* at 180–81.  Plaintiff reported that the Gabapentin causes dizziness.  AR at 181–82.  Plaintiff testified that he can walk for approximately 100 yards before needing to sit down for approximately five (5) minutes due to the pain in his legs.  *Id.* at 182.  Plaintiff further testified that he can sit approximately fifteen (15) to thirty (30) minutes at a time before he needs to get up and move to prevent swelling in his lower legs and feet,

because elevating his legs does not prevent swelling. *Id.* at 182, 187. Plaintiff also estimated that he could lift approximately ten (10) pounds. *Id.* at 182. Plaintiff described his pain as occurring everywhere, including his feet, knees, hips, and shoulders down his arm to his fingers, and noted that the pain has progressively gotten worse. *Id.* at 182–83, 188–89. Plaintiff further testified that he has pain in his hands, but is able to pick up a book or cup, move his fingers on a keyboard, and feel hot and cold. AR at 183–84. Plaintiff indicated that his pain was usually a four (4) on a scale of one (1) to ten (10), with ten (10) being the worst. *Id.* at 184. Plaintiff also noted that his migraines had improved with his current medication regimen. *Id.* at 184–85. Plaintiff confirmed that he uses a CPAP at night. *Id.* at 185–86. Plaintiff also noted that his ability to focus has diminished. *Id.* at 189.

### ii. July 27, 2017

At the second administrative hearing, Plaintiff confirmed his testimony from the previous hearing, including his education, employment history, disabling conditions, and daily activities. AR at 142–44. Plaintiff testified that he now takes at least two (2) naps per day. *Id.* at 144–45. Plaintiff further testified that his health insurance cancelled in August, and as a result he was not receiving regular treatment. *Id.* at 145, 147. Plaintiff mentioned that he was supposed to be getting an implant for his back from Pima Pain Center, but the cancellation of his health insurance prevented completion. *Id.* at 145. Plaintiff clarified that he was only seen at CODAC because it was a prerequisite to receipt of the implant. Plaintiff indicated that he was still seeking part-time, work-from-home employment. *Id.* at 145–46.

Plaintiff testified that he was sleeping longer, estimating he was able to sleep eight-and-a-half to ten (10) hours, but noted that he sometimes have leg spasms which interrupt his sleep. AR at 146–47. Plaintiff confirmed his medications as Loratadine, Amitriptyline, Hydrochlorothiazide, Cyclobenzaprine, Atenolol, Clonidine, Lisinopril, Benzonatate, Fluticasone, and Proprinoate. *Id.* at 149. Plaintiff further testified that he could walk for approximately thirty (30) minutes before needing to rest and could sit for an hour before

having a problem.  *Id.* at 149–50, 154–55.  Plaintiff estimated that he could lift approximately ten (10) pounds.  *Id.* at 150.  Plaintiff described having pain in his hands, arms, neck, lower back, and left hip.  *Id.* at 150–51.  Plaintiff explained that he had not had carpal tunnel surgery due to his lack of insurance.  AR at 151.  Plaintiff testified that he could sit at his computer for a maximum of an hour and a half, getting up every five (5) to ten (10) minutes.  *Id.*  Plaintiff further testified that he was able to pick up a book or cup.  *Id.* at 151.  Plaintiff described his pain as constant and generally a three (3) to a five (5) on a scale of one (1) to ten (10), with ten (10) being the worst.  *Id.* at 152.  Plaintiff also confirmed that he was still using a CPAP.  *Id.* at 153.

Plaintiff testified that none of the identified problems had improved since April 2013.  AR at 154.  Plaintiff denied needing assistance to manage his activities of daily living.  *Id.* at 155–56.  Plaintiff also noted that he normally does not have any restrictions in reaching above his head.  *Id.* at 156.  Plaintiff also noted that his migraines are generally well controlled with medicine.  *Id.*  Plaintiff further testified he has a walker, but does not use it unless he absolutely has to.  *Id.* at 157–58.

### b.  Administrative Forms

#### i.  *Function Report—Adult*

On October 1, 2013, Plaintiff completed a Function Report—Adult.  AR at 411–18.  Plaintiff reported that he lived in a house with family.  *Id.* at 411.  Plaintiff described the limitations of his medical conditions as follows:

> Tired all the time, after 5 hours.  Need a nap.  Can only walk for a short time (approx. 60 to 100 yds).  [D]izzy spells that come without warning, legs start aching and burning and have to set [sic] down until it passes[.]  [F]eet are numb and fell [sic] cold due to neuropathy, unable to lift much due to back and shoulder aching.  I was working as store manager which means I had to work the floor as all sales associates.

*Id.* at 411.  Plaintiff described his usual day as having some breakfast, watching television, going to doctor's appointments with his son, looking online to see if he can find a part-time job, trying to do some laundry or fixing supper for the family, and taking a nap at least

once during the day.  *Id.* at 412.  Plaintiff reported that his wife and son feed and walk the two dogs, as well as letting them out in the yard.  *Id.*  Plaintiff also reported that he cannot work like he did at his job due to dizziness and an inability to stand for long periods of time.  AR at 412.  Plaintiff indicated that prior to his illness he was able to do work in the yard and do home repairs, but now can only do these things for short periods and has difficulty with his short term memory.  *Id.*  Plaintiff reported that he now has sleep apnea; however, he has been unable to treat it because of the cost of the machine rental.  *Id.*

Regarding his personal care, Plaintiff further reported that he has trouble with bending over to put on shoes and swelling of his legs and feet, is afraid of falling in the tub due to dizziness and his legs giving out, and that it is difficult to get up from the toilet.  *Id.*  Plaintiff does not need reminders to attend to his personal hygiene but does require reminders regarding the timing and frequency of his medication.  *Id.* at 413.  Plaintiff also reported that he is able to prepare leftovers and sandwiches every other day, with preparation time up to an hour.  AR at 413.  Plaintiff noted that he had his own restaurant about twenty (20) years ago and was a cook.  *Id.*  Plaintiff reported that he does some cooking, laundry, and dish washing, but it takes twice as long as it used to.  *Id.*  Plaintiff indicated that he needs help to get up from or returning to a seated position.  *Id.*  Plaintiff further reported that he is unable to do yard work due to the long periods of bending, walking, and standing required.  *Id.* at 414.

Plaintiff also reported that he goes out every other day, and can drive and ride in a car.  AR at 414.  Plaintiff noted that he does not go out alone, because he is afraid of getting dizzy and not being able to find a place to sit or passing out.  *Id.*  Plaintiff indicated that he shops in stores for groceries and prescriptions, as well as on the computer for repair parts for his vehicle.  *Id.*  Plaintiff reported that he shops every two weeks for approximately two (2) to three (3) hours.  *Id.*  Plaintiff stated that he can count change but is unable to pay bills, handle a savings account, or use a checkbook.  *Id.*  Plaintiff indicated that his memory, as well as a lack of finances, limits these activities.  AR at 414–15.

Plaintiff described his hobbies and interests to include watching television, repairing

things, and working in his shop or on house repairs. *Id.* at 415. Plaintiff reported that he does not do these things very often or as well as he had previously because he tires easily and lacks his previous level of interest and ability. *Id.* Plaintiff denied social activities. *Id.* at 415–16. Plaintiff further reported that his conditions effect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, concentrate, understand, and use his hands. *Id.* at 416. Plaintiff indicated that he can lift twenty (20) to thirty (30) pounds; squat, bend, and reach for two (2) to three (3) minutes; stand for ten (10) to fifteen (15) minutes; walk for sixty (60) to ninety (90) yards; sit for twenty (20) to thirty (30) minutes; kneel for three (3) to five (5) minutes; walk one (1) to two (2) flights of stairs; and noted his concentration and memory are limited. AR at 416. Plaintiff acknowledged a good ability to follow written instructions when he is not rushed, but noted difficulty in following spoken instructions. *Id.* Plaintiff further reported that he generally gets along with authority figures, and is able to handle stress and changes in routine. *Id.* at 417. Plaintiff also reported that he fears losing his home and not being able to survive due to his conditions. *Id.* Plaintiff noted that he has used a walker, a brace, and a spa as prescribed by his medical providers, although currently only requires the spa. *Id.*

### ii. Work History Report

Plaintiff completed a Work History Report. AR at 397–403. Plaintiff listed his prior work as a hardware store manager. *Id.* at 397. Plaintiff described this position to include taking care of customers, administration, and inventory. *Id.* at 398. Plaintiff reported that the position required him to use machines, tools, or equipment, as well as technical knowledge or skills, and writing and completing reports, or performing other similar duties. *Id.* Plaintiff further reported that while working he stood and sat for one (1) hour per day, and walked for six (6) hours per day. *Id.* Plaintiff also reported that he frequently lifted less than ten (10) pounds, which was also the heaviest weight he lifted. AR at 398. Plaintiff indicated that he supervised thirteen (13) people, spending approximately seventy-five (75) percent of his time in that role. *Id.* Plaintiff noted that he was a lead worker and responsible for hiring and firing employees. *Id.*

### iii.    Disability Report—Appeal

On November 6, 2013, Plaintiff described the change in his condition to include sleep apnea for which he was prescribed a CPAP machine.  AR at 419.  Plaintiff also noted that he had been referred to a specialist regarding skin cancer on his nose and increased blurriness of vision.  *Id.*  Plaintiff indicated that his depression had "gotten steadily worse." *Id.*

### 2. Vocational Expert Lorian Ink Hyatt's Testimony

Ms. Lorian Ink Hyatt testified as a vocational expert at the second administrative hearing.  AR at 25, 160–62.  Ms. Hyatt described Plaintiff's past work as a retail manager, Dictionary of Occupational Titles ("DOT") number 185.167-046, with a Specific Vocational Preparation ("SVP") of 7, and a light exertional level.  *Id.* at 161.  After a brief discussion with Plaintiff, the ALJ indicated that his position was performed at the heavy level.  *Id.* 161–62.  Ms. Hyatt opined that this job did not have any transferable skills to sedentary work.  *Id.* at 162.

### 3. Plaintiff's Medical Records

#### a.  Treatment records

On October 8, 2009, Plaintiff saw Steven A. Shapiro, M.D. for an evaluation of his left shoulder pain.  AR at 565.  Plaintiff reported that he had fallen approximately four (4) feet off a ladder onto his left shoulder.  *Id.*  Dr. Shapiro noted Plaintiff's radiographs were negative and assessed tendinopathy in his left shoulder.  *Id.*  On October 21, 2009, Plaintiff began physical therapy for his left shoulder.  *Id.* at 572–73.  On November 23, 2009, Plaintiff returned to Dr. Shapiro regarding his left shoulder.  *Id.* at 564.  Dr. Shapiro's physical examination of Plaintiff noted a positive impingement sign, but no areas of pinpoint tenderness and good rotator cuff strength.  AR at 564.  Dr. Shapiro assessed rotator cuff tendinopathy of the left shoulder.  *Id.*  On December 22, 2009, Plaintiff had magnetic resonance imaging ("MRI") of his left shoulder.  *Id.* at 568.  Laura H. Lee, M.D. found "[r]otator cuff tendinosis with mild fraying of the upper border of the subscapularis tendon but no discrete rotator cuff tendon tear."  *Id.*  Dr. Lee also noted an extensive labral tear

1   and a large subacromial spur.  *Id.*

2        On February 7, 2010, Plaintiff returned to Dr. Shapiro regarding his left shoulder.

3   AR at 563.  Dr. Shapiro assessed mild rotator cuff tendinosis and biceps tendon tendinosis,

4   as well as a labral tear.  *Id.*  Plaintiff expressed an interest in surgical intervention.  *Id.*  On

5   February 12, 2010, Plaintiff underwent arthroscopy, subacromial decompression,

6   debridement, and possible labral repair  of the left shoulder.  *Id.* at 554–59, 566–67.  Dr.

7   Shapiro summarized the operative findings to include mild to moderate generalized

8   glenohumeral arthrosis with a posterior defect; partial tearing and fraying of the labrum

9   without instability, left shoulder; a 1.5 cm multilobular loose body within the joint; and

10  partial thickness tearing with bursitis of his left shoulder rotator cuff.  *Id.* at 554, 555, 557.

11  On February 18, 2010, Plaintiff saw Dr. Shapiro for a follow-up.  *Id.* at 562.  Dr. Shapiro

12  noted that the wound looked good on examination and referred Plaintiff to physical

13  therapy.  AR at 562.

14       On March 1, 2010, Plaintiff saw Dr. Shapiro for a post-surgery follow-up.  *Id.* at

15  561.  Dr. Shapiro noted that Plaintiff had an "essentially full range of motion[,] . . . minimal

16  tenderness[,] [and] . . . neurovascularly intact."  *Id.*  Plaintiff was participating in physical

17  therapy.  *Id.*  On the same date, Plaintiff began physical therapy for his left shoulder.  *Id.*

18  at 570–71.  On March 12, 2010, Plaintiff had physical therapy to improve the range of

19  motion and strength of Plaintiff's left shoulder.  AR at 569.  On April 1, 2010, Plaintiff had

20  a post-surgery follow-up with Dr. Shapiro.  *Id.* at 560.  Dr. Shapiro noted that Plaintiff had

21  a full range of motion, and Plaintiff reported little pain.  *Id.*  On September 21, 2011,

22  Plaintiff was admitted to Tucson Medical Center ("TMC") for a posterior lumbar interbody

23  fusion ("PLIF") at L5/S1.  *Id.* at 524–53.  Treatment notes that he did well with surgery

24  and his legs felt better.  *Id.* at 524.

25       On April 10, 2012, Plaintiff saw Brian P. Callahan, M.D. regarding hip and low

26  back pain, as well as strange feelings in his arms.  AR at 584.  Dr. Callahan reported that a

27  nerve conduction study of his arms showed some mild carpal tunnel syndrome.  *Id.*

28  Plaintiff declined epidural steroid injections and requested a list of home exercises in lieu

of a physical therapy referral.  *Id.*  On June 18, 2012, Plaintiff was seen by Robert Smith, M.D. after back surgery.  *Id.* at 596.  Dr. Smith noted that Plaintiff was not using any pain medication.  *Id.*  Dr. Smith reduced Plaintiff's blood pressure medication as his blood pressure was low and he reported dizziness.  AR at 596.

On April 24, 2013, Plaintiff saw Dr. Smith following being seen in the emergency department after passing out.  *Id.* at 505, 595.  Plaintiff reported that he still felt dizzy.  *Id.*  Dr. Smith noted that the cardiac studies performed in the emergency department were negative and indicated that Plaintiff had a possible cardiac arrhythmia.  *Id.*  Dr. Smith's physical examination of Plaintiff was unremarkable, and he referred Plaintiff to a cardiologist for evaluation.  *Id.*  On April 26, 2013, Plaintiff saw Susan Cerovski, PA-C for "a four-year followup [sic] regarding dizziness complicating syncope, hypertension, and hyperlipidemia."  AR at 510–13, 621–24.  PA Cerovski recounted Plaintiff's recent syncope episode and noted that the emergency department workup, including an electrocardiogram ("EKG") and chest radiographs, were negative.  *Id.* at 510, 512, 621, 623.  PA Cerovski attached a 24-hour Holter monitor to Plaintiff for the assessment of dysrhythmias.  *Id.*  On the same date, Plaintiff underwent a duplex carotid ultrasound.  *Id.* at 521, 626.  Timothy Marshall, M.D. reported a "[n]ormal carotid ultrasound with the exception of extremely minor nonobstructive plaque."  *Id.*  On April 29, 2013, Plaintiff underwent stress echocardiography.  AR at 520, 619, 620.  Dr. Marshall documented an unremarkable procedure and concluded that the stress echocardiogram was negative for ischemia, showed normal left ventricular systolic function, and mild mitral regurgitation. *Id.*  Dr. Marshall also reassured Plaintiff that his Holter monitor was benign.  *Id.*

On May 10, 2013, Plaintiff saw Michael J. Glynn, M.D. regarding episodic lightheadedness.  *Id.* at 582–83.  Dr. Glynn reviewed Plaintiff's history and outlined the tests he would pursue.  *Id.*  On May 20, 2013, Plaintiff underwent an electroencephalographic ("EEG") examination.  AR at 516–19, 615–18.  Dr. Glynn interpreted a "well-formed EEG; however, intermittent left temporal slowing is noted with occasional sharp-wave discharges suggesting a focal abnormality."  *Id.* at 516, 615.  On

1   May 29, 2013, Plaintiff saw Dr. Glynn, who noted that his MRI was normal and the EEG

2   indicated that there may be some left temporal sharp wave activity.  *Id.* at 581.

3   On June 4, 2013, Plaintiff saw Dr. Glynn for an office visit.  *Id.* at 508, 579, 612.

4   Dr. Glynn noted that Plaintiff was "on 20 mg twice a day of the Calan" and his blood

5   pressure and pulse were not much different than his pre-Calan readings.  AR at 508, 579,

6   612.  Dr. Glynn further noted that Plaintiff had not had any recurrent spells.  *Id.*  On June

7   12, 2013, Plaintiff underwent a magnetic resonance angiography ("MRA") and magnetic

8   resonance imaging ("MRI").  *Id.* at 514–15, 610, 614.  Taylor P. Chen, M.D. reported that

9   the procedures were unremarkable, as were the findings with no major vessel occlusions,

10  no significant stenoses, no aneurysms, no mass lesions, no abnormal enhancement or

11  hydrocephalus, and no chronic hemorrhage.  *Id.*  On June 14, 2013, Plaintiff saw Dr. Glynn

12  for an office visit.  *Id.* at 506, 578, 609.  Dr. Glynn reported that Plaintiff's MRI and MRA

13  were both normal.  *Id.*  Dr. Glynn further noted that he could not find a diagnosis other

14  than a possible complicated migraine headache.  AR at 506, 578, 609.  Dr. Glynn also noted

15  that Plaintiff's "[c]ranial nerves and motor function, gait, and balance [we]re all

16  unremarkable[,]" [and] [h]e ha[d] no deficits that [Dr. Glynn] c[ould] detect."  *Id.*  Dr.

17  Glynn released Plaintiff back to work.  *Id.*

18  On July 8, 2013, Plaintiff returned to Dr. Glynn for a follow-up.  *Id.* at 577, 608.

19  Dr. Glynn noted that his "attempt[] to treat [Plaintiff's lightheadedness] as complicated

20  migraine with Calan . . . [wa]s ineffective."  *Id.*  Dr. Glynn further noted that neither the

21  ENT or cardiologist could find a reason for the lightheadedness and the MRIs and MRAs

22  were unremarkable.  AR at 577, 608.  On July 17, 2013, Plaintiff returned to Dr. Glynn.

23  *Id.* at 576, 606, 607.  Dr. Glynn reviewed the extensive testing that Plaintiff had gone

24  through regarding his lightheadedness and concluded that sleep apnea may be the cause.

25  *Id.*  On July 29, 2013, Plaintiff saw Dr. Puri for further evaluation post possibly neurogenic

26  or cardiogenic syncopal episodes.  *Id.* at 1134–37.  Dr. Puri's physical examination of

27  Plaintiff was unremarkable.  *Id.* at 1136.  On July 30, 2013, Plaintiff returned to Dr. Glynn.

28  AR at 575, 605.  Dr. Glynn again posited that sleep apnea may be causing Plaintiff's

1  dizziness. *Id.* Dr. Glynn noted that he could not find any other cause, and commented that

2  Plaintiff has only had mild headaches and Dr. Glynn would keep him off the headache

3  medication. *Id.*

4      On August 8, 2013, Plaintiff underwent polysomnography. *Id.* at 1132–33. "Mr.

5  Dorsey was unhappy with the process of the PSG, however showed severe sleep apnea and

6  hypoxia." *Id.* at 1132. On August 19, 2013, Plaintiff saw Amitab Puri, M.D. for a

7  pulmonary follow-up. AR at 597–604, 1127–31. Dr. Puri noted that Plaintiff had complete

8  otolaryngology and cardiology evaluations and was ultimately referred from neurology for

9  a sleep apnea study. *Id.* at 598, 601, 1128. Dr. Puri reviewed Plaintiff's polysomnogram

10 results which indicated he had severe sleep apnea, and periodic limb movement was noted.

11 *Id.* Dr. Puri's physical examination of Plaintiff was generally unremarkable. *Id.* at 599,

12 602–03. On August 27, 2013, Plaintiff underwent another polysomnography. *Id.* at 1125–

13 26. Dr. Puri noted that the polysomnography was unremarkable and the data were adequate

14 for interpretation. AR at 1125. On September 9, 2013, Plaintiff returned to Dr. Puri for a

15 follow-up regarding his sleep study. *Id.* at 1120–24. Dr. Puri's physical examination of

16 Plaintiff was unremarkable. *Id.* at 1122–23. Regarding Plaintiff's sleep study, Dr. Puri

17 noted that "[s]leep latency was long[,] [b]ut once asleep, sleep was well consolidated." *Id.*

18 at 1121. Dr. Puri recommended a "CPAP at 15 cm with a C-Flex unit with a level of 3"

19 for Plaintiff. *Id.*

20     On October 29, 2013, Plaintiff saw Dr. Smith and expressed frustration regarding

21 the lack of answers for his complaints of pain and fatigue. AR at 594. Dr. Smith suggested

22 that the absence of other findings may mean that fibromyalgia is the cause. *Id.* On

23 November 25, 2013, Plaintiff was seen at Ironwood Dermatology regarding lesions on his

24 right nasal supratip. *Id.* at 637–39. Colin R. Trout, M.D. performed a skin biopsy and

25 recommended continued observation. *Id.* at 639. On December 30, 2013, Plaintiff was

26 seen by Jerold J. Olson, M.D. for excision of a basal cell carcinoma on his right nasal tip.

27 *Id.* at 660–63. Dr. Olson performed the resection without incident. AR at 660–61.

28     On January 3, 2014, Plaintiff returned to Dr. Olson for a dressing change. *Id.* at

659–60.  Dr. Olson noted the wound was healing well.  *Id.* at 660.  On January 10, 2014, Plaintiff saw Dr. Olson for a post-operative follow-up.  *Id.* at 659.  Dr. Olson's examination was unremarkable.  *Id.*  On February 11, 2014, Plaintiff saw Dr. Olson for a follow-up post-excision of his basal cell carcinoma.  AR at 659, 664.  Dr. Olson noted that the wound had healed well and there was no evidence of recurrence.  *Id.*  On March 26, 2014, Plaintiff was seen by Jeffrey S. Maltzman, M.D. for a glaucoma evaluation.  *Id.* at 647–56.  Dr. Maltzman reported that "[c]ataracts account for the patient's complaints[,] [and] [n]o treatment [was] currently recommended."  *Id.* at 652.

On November 6, 2014, Gerald E. Morris, M.D. completed a Medical Source Statement—Depression for Plaintiff.  *Id.* at 667–70.  Dr. Morris opined that Plaintiff had a mood disturbance accompanied by full or partial depressive syndrome.  AR at 667.  Dr. Morris further opined that this depressive syndrome was characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbances with a change in weight, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking.  *Id.*  Dr. Morris described Plaintiff's functional limitations due to his mental disorder as a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate deficiencies of concentration, persistence or pace; and moderate episodes of deterioration or decompensation in work or work-like settings.  *Id.* at 669.

On December 9, 2014, Plaintiff had an initial physical therapy appointment.  *Id.* at 708–10, 861–63, 1052–54.  Plaintiff described a chronic history of neck pain and numbness bilaterally in his upper extremities.  *Id.* at 708, 861, 1052.  Vanessa Morton, PT noted that Plaintiff's pain and symptoms were consistent with cervical radiculopathy, likely affecting the C7 nerve root.  AR at 710, 863, 1054.  Ms. Morton also noted that Plaintiff "exhibit[ed] signs of neural tension in median nerve bilaterally."  *Id.*  Plaintiff continued to receive physical therapy treatments from Ms. Morton on December 11, 15, 18, and 22, 2014.  *Id.* at 864–68, 1055–59.  On December 17, 2014, Plaintiff saw Dr. Morris for a follow-up regarding his blood pressure and neck pain.  *Id.* at 704–07.  Dr. Morris noted that Plaintiff

showed a decreased range of motion of his neck and tenderness of the paracervical muscles, both of which remained unchanged from his October 29, 2014 visit. *Id.* at 706. Dr. Morris further noted that Plaintiff was undergoing physical therapy for his neck pain and prescribed a muscle relaxer. AR at 707. Dr. Morris also reported that Plaintiff's mood was improving. *Id.*

On January 13, 2015, Plaintiff saw Ms. Morton for a re-evaluation visit. *Id.* at 711–12, 869–70, 1060–61. Plaintiff "report[ed] less tension in [his] neck but continue[d] to have tingling and numbness in bilateral [upper extremities]." *Id.* at 711, 869. Ms. Morton noted that Plaintiff had made little progress with physical therapy, although his strength had improved slightly and tension reduced. *Id.* at 712, 870. On January 28, 2015, Plaintiff saw Dr. Morris for a follow-up regarding his blood pressure and neck pain. AR at 700–03. Dr. Morris noted a miscommunication regarding Plaintiff's blood pressure medications and that Plaintiff's neck pain was not well controlled after physical therapy. *Id.* at 700, 702. Plaintiff reported "[s]till having episodes of numbness and tingling in both upper extremities." *Id.* Dr. Morris's physical examination of Plaintiff was unremarkable. *Id.* at 701. Plaintiff indicated that he had stopped taking Wellbutrin, and Dr. Morris noted that Plaintiff's mood appeared to be okay and he could continue without medication. *Id.* at 700, 702. Dr. Morris also noted that Plaintiff continued to have periodic muscle fasciculations, which Plaintiff had previously declined to treat after an EEG, but would now go for a neurological reevaluation. AR at 702. On February 10, 2015, Plaintiff was seen by Lloyd Coaker, M.D. regarding his sleep apnea. *Id.* at 718–19. Dr. Coaker ordered a sleep titration study. *Id.* at 719.

On March 11, 2015, Plaintiff returned to Dr. Morris for a follow-up regarding his neck pain and high blood pressure. *Id.* at 696–99. Dr. Morris noted that Plaintiff's blood pressure was improved, but still elevated, and his neck pain was still not well controlled with numbness and tingling in both upper extremities. *Id.* at 696, 698. Dr. Morris further noted degenerative changes in Plaintiff's cervical spine on x-ray. AR at 696, 698. Plaintiff was scheduled for a sleep study and reported severe fatigue, non-restful sleep, and

1    abnormal limb movements.  *Id.*  Dr. Morris's physical examination of Plaintiff was

2    unremarkable.  *Id.* at 697–98.  Dr. Morris indicated that Plaintiff's neck pain, muscle

3    fasciculations, cervical radiculopathy, and obstructive sleep apnea remained unchanged.

4    *Id.* at 698–99.

5           On April 17, 2015, Plaintiff was discharged from physical therapy.  *Id.* at 871, 1062.

6    Ms. Morton reported that Plaintiff had little progress and did not require further treatment.

7    AR at 871, 1062.  On April 20, 2015, Plaintiff had an MRI of his cervical spine.  *Id.* at

8    680–81, 714–15, 974–75.  Bradley J. Bohnert M.D. noted "[m]ild degenerative changes

9    throughout the cervical spine, with tiny central disc protrusion at C5–6[,] . . . [and] no

10   significant cord compression with multilevel foraminal narrowing which is moderate to

11   severe on the left at C3–4."  *Id.* at 681, 715, 975.  On the same date, Plaintiff returned to

12   Dr. Morris for a follow-up regarding his hypertension.  *Id.* at 692–95.  Dr. Morris noted

13   that Plaintiff's blood pressure was improved but still occasionally elevated.  *Id.* at 692, 694.

14   Dr. Morris further noted that Plaintiff was still having abnormal limb movements, and

15   Neurology had prescribed Gabapentin but Plaintiff had not yet begun taking it.  AR at 692.

16   Dr. Morris's physical examination of Plaintiff was unremarkable.  *Id.* at 693–94.  Dr.

17   Morris prescribed an additional blood pressure medication and advised Plaintiff to begin

18   the Gabapentin.  *Id.* at 694–95.

19          On May 6, 2015, Plaintiff underwent a sleep study.  *Id.* at 720–23.  Philip Eichling,

20   M.D.'s diagnostic impression included "[s]evere obstructive apnea with hypoxemia;

21   treated marginally adequately with 11 cm of CPAP[,] . . . [and] [a] [c]linical history of

22   restless legs with some PLMS noted during the treatment phase."  *Id.* at 721.

23          On June 9, 2015, Plaintiff saw Dr. Coaker following his sleep study.  AR at 717.

24   Dr. Coaker noted that Plaintiff showed improvement following the study and use of a new

25   CPAP machine.  *Id.*  On June 15, 2015, Plaintiff saw Dr. Morris for a follow-up regarding

26   his medications, blood pressure, and neck pain.  *Id.* at 685–89, 841–45.  Dr. Morris noted

27   that Plaintiff's blood pressure was well controlled; however, he was still having episodes

28   of abnormal limb movements and tingling in the upper extremities.  *Id.* at 685, 687, 841,

843.   Dr. Morris further indicated that Gabapentin modestly controlled Plaintiff's symptoms and his MRI of the neck showed degenerative disc and joint disease throughout the cervical spine.   *Id.*   Dr. Morris also noted that Plaintiff's depression and anxiety symptoms were slightly worse due to Plaintiff's increasing neck and memory issues.  AR at 685, 688, 841, 844.  Dr. Morris's physical examination of Plaintiff was unremarkable. *Id.* at 687, 843.  On the same date, Dr. Morris completed a Medical Source Statement— Anxiety for Plaintiff.  *Id.* at 671–73.  Dr. Morris opined that Plaintiff exhibited generalized persistent anxiety accompanied by apprehensive expectation and vigilance and scanning. *Id.* at 671.  Dr. Morris also opined that Plaintiff exhibited a persistent irrational fear of a specific object, activity, or situation which resulted in a compelling desire to avoid the same.   *Id.*   Dr. Morris characterized Plaintiff's functional limitations as moderate in restriction of activities of daily living; difficulties in maintaining social functioning; deficiencies of concentration, persistence, or pace; and episodes of deterioration or decompensation in work or work-like settings.  AR at 672.  Dr. Morris further opined that "[d]ue to [Plaintiff's] chronic neck issues, his anxiety is slowly increasing over the past few months[,]" and noted that Plaintiff was under the care of a specialist.  *Id.* at 673.

On July 3, 2015, Plaintiff saw Moeen Din, M.D. for a follow-up regarding muscle spasms, as well as numbness and tingling in his upper extremities.  *Id.* at 674–77.  Dr. Din's physical examination was unremarkable.   *Id.*   Dr. Din further noted that "an MRI of [Plaintiff's] cervical spine . . . showed no significant abnormalities."  *Id.* at 674.  On July 6, 2015, Plaintiff had radiographs of his right hip.  AR at 716, 749, 846.  Jason Chesley, M.D. read Plaintiff's films and did not find any significant degenerative changes in a normal hip.  *Id.*  On the same date, Plaintiff returned to Dr. Din for electromyography ("EMG") and a nerve conduction velocity test ("NCV") of his upper extremities.  *Id.* at 792–94, 801–03, 927–28, 976–78.  Dr. Din noted that the tests showed bilateral carpal tunnel syndrome.  *Id.* at 792, 803, 978.  Plaintiff indicated to Dr. Din that he was "not interested in seeing a hand surgeon yet."  *Id.* at 792, 978.  Plaintiff also complained of left hip pain.  AR at 792.  Dr. Din's physical examination of Plaintiff was unremarkable.  *Id.*

at 793.  On July 27, 2015, Plaintiff returned to Ms. Morton for additional physical therapy.  *Id.* at 751–52, 847–48, 872–73, 1063–64.  Plaintiff complained of difficulty walking due to localized right lateral hip and groin pain, as well as numbness in his groin area.  *Id.* at 751, 847, 872, 1063.  Ms. Morton noted that Plaintiff's "[r]ight hip pain [was] consistent with possible anterior impingement[,] [with] [d]ecreased hip mobility and limited length of hamstrings and hip flexors [] also contributing to symptoms." *Id.* at 752, 848, 873, 1064.  On July 29, 2015, Plaintiff saw Tim Loebbaka, PTA for treatment.  AR at 874–75, 1065–66.  Plaintiff reported that his hips felt "a little tight from [therapeutic exercises] and increased activity." *Id.* at 874, 1065.  Mr. Loebbaka noted that Plaintiff had a good response to treatment.  *Id.*  On July 31, 2015, Plaintiff was seen by John A. Maltry, M.D. for an initial consult regarding his right hip pain.  *Id.* at 754.  Dr. Maltry noted that Plaintiff's radiographs showed a completely normal right hip joint.  *Id.*  Dr. Maltry opined his strong suspicion that Plaintiff's right thigh pain was "radicular in nature and emanating from his lumbar spine."  AR at 754.

On August 3, 2015, Plaintiff saw Dr. Morris for a follow-up visit regarding his neck pain.  *Id.* at 755–58, 837–40.  Dr. Morris noted that Plaintiff's blood pressure was well-controlled, but there had been no change in his cervical radiculopathy symptoms.  *Id.* at 755, 837.  Plaintiff also saw Mr. Loebbaka for physical therapy.  *Id.* at 876–77, 1067–68.  Plaintiff reported feeling "a little stiff" but did not report any increased pain.  *Id.* at 876, 1067.  Mr. Loebbaka noted Plaintiff showed "[f]air improvement with [soft tissue mobilization] and manual stretches" with a good response to treatment.  AR at 876, 1067.  Plaintiff returned to Mr. Loebbaka on August 5th and August 10, 2015 for physical therapy.  *Id.* at 878–81, 1043–44, 1069–70.  Plaintiff reported little change in his hip pain during this time.  *See id.*  On August 12, 2015, Plaintiff saw Ms. Morton for physical therapy, again reporting little change in his hip pain.  *Id.* at 882–83, 1045–46.  Ms. Morton noted that Plaintiff did not have any tenderness over his tensor fasciae latae or gluteus muscles and had "good tolerance to hip mobilizations and demonstrates improved hip mobility in all planes following hip mobilization." *Id.* at 883, 1046.  On August 17, 2015, Plaintiff

returned to Ms. Morton for a physical therapy session.  AR at 884–85, 1047–48.  Plaintiff reported that his "hip [wa]s about the same[,] [but] fe[lt] that his hip mobility [wa]s improving a little."  *Id.* at 884, 1047.  Ms. Morton noted that Plaintiff "[c]ontinue[d] to have limited hip mobility in all planes bilaterally[,] . . . [and] some increased pain with caudal glides to left hip today."  *Id.* at 885, 1048.  Ms. Morton further observed that Plaintiff "[d]emonstrate[d] decreased core and glut recruitment which is contributing to symptoms."  *Id.*  Ms. Morton also noted that Plaintiff "[t]olerate[d] all exercises well today without aggravation of symptoms."  *Id.*  On August 18, 2015, Dr. Morris completed a second Medical Source Statement—Anxiety regarding Plaintiff.  AR at 724–26, 760–62.  Dr. Morris opined that Plaintiff exhibited generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, and apprehensive expectation.  *Id.* at 724, 760.  Dr. Morris also confirmed that Plaintiff experienced recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week, as well as recurrent and intrusive recollections of a traumatic experience which are a source of marked distress.  *Id.*  Dr. Morris opined that Plaintiff had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; and marked deficiencies of concentration, persistence, or pace, as well as episodes of deterioration or decompensation in work or work-like settings which cause him to withdraw from that situation or to experience an exacerbation of signs or symptoms.  *Id.* at 725, 761.  Dr. Morris further opined that Plaintiff's symptoms had gotten worse and noted Plaintiff found it "very difficult to multitask and deal with mentally stressful situations."  *Id.* at 726, 762.  On the same date, Dr. Morris completed a form entitled "Questions to Doctor about my Condition."  AR at 727–28, 763–64.  Dr. Morris referred, without further comment, to Plaintiff's medical records regarding his April 20, 2015 cervical spine MRI; April 21, 2015 blood work results; October 22, 2014 laboratory results; September 29, 2014 cervical spine radiographs; and April 21, 2015 laboratory results.  *Id.* at 727, 729–45, 763.  Dr. Morris opined that Plaintiff's memory loss problems were likely due to his sleep apnea and depression.  *Id.* at

727, 763.  Dr. Morris further opined that Plaintiff's leg pain was possibly due to his lower back, but Plaintiff needed to follow up with his back surgeon.  *Id.*  Dr. Morris noted that Plaintiff had radicular neck and back pain and muscle fasciculations.  *Id.*  Dr. Morris reviewed Plaintiff's medications and opined that Plaintiff's chronic neck and back pain, as well as worsening depression, prevented him from working.  AR at 727–28, 763–64.  On August 19, 2015, Plaintiff saw Emil Annabi, M.D. to establish care at the Pima Pain Center.  *Id.* at 767–71, 896–900, 1018–22.  Stephen A. Shiller, M.D., Dr. Annabi's associate, noted that Plaintiff's "[p]ain [wa]s most consistent with cervical radiculopathy (with positive Spurling's) versus cervical facet arthropathy (positive rotational and facet loading pain)."  *Id.* at 771, 900, 1022.  Dr. Shiller further noted that Plaintiff's "[c]ervical MRI was reviewed showing [a herniated nucleus pulposus] at C5–6 with facet degenerative changes throughout."  *Id.*  Dr. Shiller's physical examination of Plaintiff was unremarkable except for moderate cervical spine pain with axial loading, a positive Spurling's test, and positive facet loading.  *Id.* at 770, 899, 1021.  On August 20, 2015, saw Ms. Morton for a physical therapy re-evaluation.  AR at 886–87, 1049–50.  Plaintiff reported "little progress with physical therapy."  *Id.* at 886, 1049.  Ms. Morton noted that Plaintiff "demonstrate[d] small improvement in hip mobility and slump test [wa]s negative although he still ha[d] evidence of neural tension in [right lower extremity]."  *Id.*  Ms. Morton further indicated that Plaintiff was compliant with his home exercise program.  *Id.*  On August 21, 2015, Plaintiff saw Dr. Din for a follow-up.  *Id.* at 795–97, 929–30.  Plaintiff complained of increased pain in his hands.  AR at 795, 929.  Dr. Din noted that he reviewed Plaintiff's MRI of his cervical spine and it showed no significant abnormalities.  *Id.*  Dr. Din's physical examination of Plaintiff was unremarkable.  *Id.* at 796, 930.

On September 3, 2015, Plaintiff returned to Dr. Callahan complaining of neck pain into his shoulders with numbness and tingling in his hands, as well as right leg pain.  *Id.* at 805–07.  Dr. Callahan noted that Plaintiff's cervical spine MRI showed cervical spondylosis, worse at C3–4, with foraminal narrowing at that level.  *Id.*  Dr. Callahan's physical examination of Plaintiff was generally unremarkable, but he noted tenderness on

1   palpation in his neck and low back, as well as bilateral Tinel sign at the wrists.  AR at 805.

2   Dr. Callahan further noted that Plaintiff's MRI did not show any significant nerve root

3   compression and that a lot of his symptoms may be derived from his carpal tunnel

4   syndrome.  *Id.* at 806.  On September 25, 2015, returned to Dr. Annabi for a cervical

5   epidural steroid injection ("CESI").  *Id.* at 894–95, 1025–26.  The procedure was

6   unremarkable.  *Id.* at 894, 1025.

7          On October 7, 2015, Plaintiff had an MRI of his lumbar spine.  *Id.* at 808–09.  Creed

8   Rucker, M.D. noted "stable postoperative changes of anterior-posterior fusion procedure

9   with patent central canal and foramina" at L5–S1 and "stable mild-moderate central canal

10  narrowing at L4–L5."  AR at 809.  Plaintiff's MRI was otherwise unremarkable.  *Id.* at

11  808.  On October 15, 2015, Plaintiff saw Daniela M. Donoso Pena, M.D. to establish care.

12  *Id.* at 772–79, 829–36.  Dr. Donoso Pena's physical examination of Plaintiff was

13  unremarkable.  *Id.* at 777.  Dr. Donoso Pena noted a decreased range of motion in Plaintiff's

14  neck and tenderness of the paracervical muscles that was unchanged from his August 3,

15  2015 visit with Dr. Morris, as was the slightly decreased abduction strength in both upper

16  extremities.  *Id.*  Dr. Donoso Pena also noted a slightly decreased grip strength in both

17  upper extremities.  AR at 777.  On the same date, Plaintiff underwent electromyography

18  and an NCV due to lumbar radiculopathy.  *Id.* at 810–13.  Dr. Song interpreted the studies

19  as "compatible with possible left S1 radiculopathy."  *Id.* at 810.  On the same date, Plaintiff

20  also had laboratory blood work performed.  *Id.* at 781–88, 821–28.  On October 16, 2015,

21  saw Dr. Annabi for a CESI.  *Id.* at 1023–24.  The procedure was performed without

22  complication.  AR at 1023.  On October 23, 2015, Plaintiff returned to Dr. Din for a follow-

23  up.  *Id.* at 798–800, 931–32.  Dr. Din's physical examination of Plaintiff was unremarkable.

24  *Id.* at 799, 932.

25         On November 6, 2015, Plaintiff returned to Dr. Annabi for a scheduled visit.  *Id.* at

26  889–93, 1006–10.  Dr. Annabi noted that Plaintiff had a series of cervical epidural steroid

27  injections ("CESI") and "noticed 70–80% relief of pain and lasting till today."  *Id.* at 890,

28  893, 1007, 1010.  Plaintiff's "main complaint . . . [wa]s his neck pain especially on

1   extension of the cervical spine."  AR at 893, 1010.

2   On December 7, 2015, Ms. Morton discharged Plaintiff from physical therapy with

3   instructions to continue his home exercise program.  *Id.* at 906, 1051.  On December 14,

4   2015, Plaintiff saw Dr. Donoso Pena for a follow-up to discuss specialist referrals.  *Id.* at

5   815–20, 907–12.  Dr. Donoso Pena's physical examination of Plaintiff was unremarkable.

6   *Id.* at 819, 911.  Dr. Donoso Pena noted that Plaintiff needed a referral for a spinal

7   stimulator for his lumbar pain.  *Id.* at 817, 909.  On December 30, 2015, Plaintiff returned

8   to Pima Pain Management for a follow-up.  AR at 856–60, 1001–05.  Stephen A. Shiller,

9   M.D. noted that Plaintiff's pain was "most consistent with cervical radiculopathy (with

10  positive Spurling's)."  *Id.* at 860, 1005.  Dr. Shiller reported that Plaintiff "underwent a

11  cervical epidural steroid injection[][,] . . . [and] state[d] that his radicular pain [wa]s much

12  improved and continue[d] to be improved over 75 percent."  *Id.*  Dr. Shiller expressed a

13  desire "to get authorization to do cervical medial branch blocks diagnostically to figure out

14  if ultimate radiofrequency ablation would be effective."  *Id.*  Dr. Shiller further noted that

15  Plaintiff did not take any medication for his pain.  *Id.*  Dr. Shiller also discussed with

16  Plaintiff treatment of his lumbar radicular pain.  AR at 860, 1005.  On the same date,

17  Plaintiff saw Dr. Din for a follow-up visit.  *Id.* at 933–35, 963–65.  Plaintiff reported

18  continued "numbness and tingling which wakes him up at night time [sic]."  *Id.* at 933,

19  963.  Dr. Din's physical examination of Plaintiff was unremarkable.  *Id.* at 934–35, 964–

20  65.

21  On January 27, 2016, Plaintiff saw Dr. Annabi for a CESI.  *Id.* at 995–96.  The

22  procedure was unremarkable.  AR at 995.  On February 17, 2016, Plaintiff saw Dr. Annabi

23  regarding his pain management.  *Id.* at 851–55, 913–17, 990–94, 1082–86.  Plaintiff

24  reported little change regarding overall pain, sleep, and energy level.  *Id.* at 851, 913, 990,

25  1082.  Plaintiff also reported that his current pain level was 3/10, but had not received any

26  recent treatments or interventions.  *Id.*  Dr. Annabi noted that Plaintiff was doing well, and

27  that cervical epidural steroid injections afforded greater than 75% relief of pain.  *Id.* at 855,

28  917, 994, 1086.  Dr. Annabi suggested a series of epidural injections to reduce the

inflammation.  AR at 855, 917, 994, 1086.

On March 23, 2016, Plaintiff returned to Dr. Shiller for a follow-up visit.  *Id.* at 920–24, 985–89, 1075–76.  Plaintiff reported "that since his last visit with us his pain has greatly improved, [and] he state[d] that the current amount of medication being prescribed is just right for him[.]"  *Id.* at 921, 986, 1076.  Dr. Shiller's physical examination of Plaintiff was unremarkable.  *Id.* at 922–23, 987–88, 1077–78.  Dr. Shiller noted that Plaintiff was "still getting great results from the CESI series."  *Id.* at 924, 989, 1079.  Plaintiff reported "he gets more than 75 percent relief of pain with the injections."  AR at 924, 989, 1079.  On March 30, 2016, Plaintiff returned to Dr. Din for a follow-up visit.  *Id.* at 936–39, 966–69.  Plaintiff reported that "he was in the ER due to the fact that his blood pressure was very high[,] . . . [and] state[d] he has been getting shots from the pain clinic, which has been helping his carpal tunnel."  *Id.* at 936, 966.  Plaintiff further reported that "he ha[d] not had a shot for about 4 weeks and his carpal tunnel has been starting to bother him again."  *Id.*  Plaintiff also stated that "[h]e also has pain in both hips[,] . . . [and] cannot walk any distance without assistance or something to hold onto."  *Id.*  Dr. Din's physical examination of Plaintiff was unremarkable.  AR at 937–38, 967–68.  On April 27, 2016, Plaintiff returned to Dr. Din for a Lumbar Transforaminal Epidural Steroid Injection ("TF–ESI").  *Id.* at 983–84, 1080–81.  The procedure was unremarkable.  *Id.* at 983, 1080.

On June 17, 2016, Plaintiff returned to Dr. Din for a follow-up visit.  *Id.* at 940–43, 970–73.  Plaintiff indicated that he was doing about the same and that injections helped for the pain in his groin but not his hip.  AR at 940, 970.  Plaintiff reported that his lower back pain was unchanged.  *Id.*  Plaintiff also reported that he was depressed.  *Id.*  Dr. Din's physical examination of Plaintiff was unremarkable.  *Id.* at 941–42, 971–72.  Dr. Din assessed polyneuropathy of Plaintiff's legs and requested a follow-up regarding a stimulator from the pain service.  *Id.* at 942.  Plaintiff declined refills of his medications.  *Id.*

On July 13, 2016, Plaintiff underwent bilateral functional endoscopic sinus surgery ("FESS") and septoplasty.  AR at 1115–17.  Eugene Chang, M.D. saw Plaintiff for a post-

operative follow-up and performed a nasal endoscopy with debridement.  *See id.*  On December 15, 2016, Plaintiff saw Alma Loveres, FNP at Marana Health Center regarding medication refills, as well as skin lesions.  *Id.* at 1110–14.  NP Loveres referred Plaintiff to dermatology.  *Id.* at 1112.

On April 6, 2017, Plaintiff saw Alma Loveres, FNP at Marana Health Center complaining of a cough.  *Id.* at 92–97, 1097–1102.  Plaintiff reported that his cough was always associated with nasal symptoms.  AR at 92, 1097.  As such, NP Loveres directed him to treat his allergic rhinitis which she expected would resolve his cough.  *Id.* at 94, 1099.  On April 12, 2016, Plaintiff saw Lina A. Rosin, NP, BHMP for a psychiatric evaluation prior to surgery.  *Id.* at 1033–36.  NP Rosin's mental status examination of Plaintiff was unremarkable.  *Id.* at 1034.  Plaintiff's Axis I diagnosis included "[d]epressive disorder due to another medical condition with major depressive-like episode."  *Id.*  NP Rosin did not note any Axis II diagnoses, but noted Axis III included hypertension, asthma, obesity, and sleep apnea.  AR at 1035.  NP Rosin further noted Axis IV included "[p]roblems with/related to occupation, access to health care services, and Axis V included a global assessment of functioning ("GAF") of 75.  *Id.*  On the same date, Mahmoud Moghaddami, APRN, PMHNP–BC, BHMP, unconditionally approved Plaintiff psychiatrically for surgery.  *Id.* at 950.  On April 18, 2017, Plaintiff returned to NP Loveres regarding diarrhea and blood in his stool, but declined an assessment for hemorrhoids.  *Id.* at 87–91, 1092–96.

On October 31, 2017, Plaintiff saw NP Loveres for a refill of his blood pressure medication, and also complained of chronic lower back and neck pain with a history of degenerative disc disease in his cervical spine with radiculopathy, as well as lumbar back pain with radiculopathy.  *Id.* at 79–86.  Plaintiff explained that he was to have a spinal cord stimulator implant; however, his insurance ran out before he was able to have the procedure.  AR at 79.

On February 21, 2018, Plaintiff returned to NP Loveres for a follow-up regarding his blood pressure, and also complained of left breast pain and bilateral hip pain, which

was worse on the right.  *Id.* at 73–78.  NP Loveres noted that Plaintiff's prior hip radiographs were unremarkable, but he reported "pain with palpation and pin point tenderness over the 'bony area of the hip bone[.]'"  *Id.* at 73.  NP Loveres also noted Plaintiff's left breast felt fuller and harder with a small, slightly raised brownish discolored lesion on the nipple and pain with palpation.  *Id.* at 76.  On the same date, Plaintiff had bilateral hip radiographs taken which were unremarkable.  *Id.* at 122.  On February 23, 2018, NP Loveres called Plaintiff to inform him that his laboratory results showed that he was not hydrating well and his cholesterol continued to be elevated, requiring an adjustment to his medication.  AR at 118.  On March 22, 2018, Plaintiff underwent a bilateral breast ultrasound and mammogram.  *Id.* at 123–25.  Amado Del Rosario, D.O. assessed a benign gynecomastia.  *Id.* at 124.

On April 20, 2018, Plaintiff saw NP Loveres regarding coughing and abdominal pain and for his imaging results.  *Id.* at 67–72.  Plaintiff's breast imaging showed a gynecomastia and no malignancy.  *Id.* at 67.  NP Loveres also noted Plaintiff continued to have a chronic cough despite treatment for acid reflux and allergies.  AR at 67.  On April 26, 2018, Plaintiff had an ultrasound of his scrotum and testicles.  *Id.* at 126–27, 134–35.  Adam Kupper, M.D. assessed an "[i]ll-defined subcentimeter hypoechoic focus at the inferior aspect of the left testicle."  *Id.* at 127, 135.  On the same date, Plaintiff also underwent an ultrasound of his abdominal right upper quadrant for his epigastric pain.  *Id.* at 128–29.  Angela Fried, M.D.'s impression included hepatomegaly with hepatic steatosis and a benign right renal cyst.  *Id.* at 128.

On May 8, 2018, Plaintiff saw NP Loveres for a follow-up.  AR at 60–66.  NP Loveres noted that Plaintiff required an evaluation for Chronic Obstructive Pulmonary Disease ("COPD") and a mass in his testicle, and directed his case manager to assist with finding a more affordable specialist and obtaining health insurance.  *Id.* at 60.  NP Loveres also noted that Plaintiff's abdominal imaging was positive for fatty liver and a renal cyst.  *Id.*  On May 14, 2018, NP Loveres wrote a letter outlining Plaintiff's chronic health problems which included COPD, hypertension, obstructive sleep apnea, morbid obesity,

degenerative cervical disk disease with radiculopathy, and chronic lumbar pain with radiculopathy.  *Id.* at 132.  NP Loveres also noted that Plaintiff was under evaluation regarding his testicular mass.  *Id.*  On May 25, 2018, Plaint had chest radiographs taken.  AR at 130.  Patrick Millerd, M.D. noted that the chest series was unremarkable.  *Id.*

On June 5, 2018, Plaintiff saw NP Loveres for a follow-up.  *Id.* at 54–59.  NP Loveres reviewed his chest radiograph and confirmed that Plaintiff had COPD.  *Id.* at 54.  Plaintiff also reported bilateral hip pain that Dr. Klein diagnosed as bursitis.  *Id.*  On June 15, 2018, John Klein, M.D. completed a Treating Source Statement — Physical Conditions on behalf of Plaintiff.  AR at 47–50.  Dr. Klein indicated that he had treated Plaintiff three (3) times since April 25, 2018.  *Id.* at 47.  Dr. Klein reported that Plaintiff had bursitis in both hips, with an onset of January 2013.  *Id.* at 47–48.  Dr. Klein opined that Plaintiff would be "off task" more than twenty-five (25%) of the time and would be absent more than four (4) days per month.  *Id.* at 47.  Dr. Klein further opined that Plaintiff could occasionally lift and carry up to twenty (20) pounds.  *Id.* at 48.  Dr. Klein also opined that Plaintiff could walk for one (1) hour, and stand and sit for two (2) hours in an eight (8) hour workday.  AR at 48.  Dr. Klein indicated that Plaintiff did not require any assistive devices.  *Id.*  Dr. Klein opined that Plaintiff could continuously reach overhead and elsewhere, handle, finger, feel, push, and pull with both arms or hands; continuously use foot controls with either foot; continuously rotate his head and neck; occasionally balance, stoop, and crawl; rarely climb stairs, ramps, ladders, and scaffolds or kneel; and never crouch.  *Id.* at 49–50.  Dr. Klein further opined that Plaintiff could rarely be at unprotected heights, but could continuously be around moving mechanical parts; operating a vehicle; humidity and wetness; dust, odors, fumes, and pulmonary irritants; extreme cold; extreme heat; and vibrations.  *Id.* at 50.

### b.  Examining physician

On February 3, 2014, Plaintiff saw Hunter Yost, M.D. for a psychiatric evaluation.  AR at 640–44.  Dr. Yost did not review any medical records prior to the examination.  *Id.* at 640.  Plaintiff reported taking an antidepressant in 2010 which had been prescribed by

his neurologist.  *Id.*  His wife reports that he appeared more upbeat during this time; however, Plaintiff stopped taking the medication because he became upset with the neurologist.  *Id.*  Plaintiff further reported his April 2013 episode of dizziness and syncope. *Id.*  Plaintiff explained that "he lost his job because he did not have a doctor's release to go back to work[,] [and] [w]hen he did receive it, it was too late to get his job back."  AR at 640.  Plaintiff also expressed concern that his wife was in danger of losing her job due to new ownership, and described feeling stressed and aggravated by these events.  *Id.*  Plaintiff reported taking Topiramate, Atenolol, and Ranitidine, as well as Ambien occasionally.  *Id.* at 641.  Plaintiff further reported that he had been diagnosed with sleep apnea, but could not continue CPAP treatment due to a high insurance deductible.  *Id.*  Plaintiff described his average day to include waking up between 2:00 and 3:00 a.m. and returning to sleep until 6:00 or 7:00 a.m., spending approximately four (4) hours on the internet searching for jobs, doing household chores, preparing some dinner, watching some television, and going to bed between 9:00 and 10:00.  *Id.*  Plaintiff noted that he performs more chores because he is home and his wife is working.  AR at 641.  Dr. Yost described Plaintiff as pleasant, congenial, and cooperative, and noted a euthymic mood, good eye contact, coherent and fluent speech, and no homicidal or suicidal thinking.  *Id.*  Plaintiff scored thirty (30) out of thirty (30) on his Mini Mental Status Exam and Dr. Yost reported that there was no evidence of thought disorder, hallucinations or delusions, Plaintiff's grammar and vocabulary were adequate, and his insight and judgment were good.  *Id.*  Dr. Yost diagnoses included Axis I–adjustment disorder with mixed features due to multiple stressors and physical issues; Axis II–no diagnosis; Axis III–migraine headaches, hypertension, obesity; Axis IV–social support with wife; and Axis V–Current GAF 71 to 80.  *Id.*  Dr. Yost also completed a Psychological/Psychiatric Medical Source Statement on behalf of Plaintiff. *Id.* at 642–43.  Dr. Yost opined that Plaintiff had a current psychological diagnosis, but did not expect any limitations to last for twelve (12) continuous months.  AR at 642.  Dr. Yost further opined that Plaintiff was capable of managing benefit payments in his/her own interest.  *Id.* at 643.

1

2      **II.     STANDARD OF REVIEW**

3            The factual findings of the Commissioner shall be conclusive so long as they are

4      based upon substantial evidence and there is no legal error.   42 U.S.C. §§ 405(g),

5      1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).   This Court may

6      "set aside the Commissioner's denial of disability insurance benefits when the ALJ's

7      findings are based on legal error or are not supported by substantial evidence in the record

8      as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see*

9      *also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

10           Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

11     preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d

12     871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

13     Further, substantial evidence is "such relevant evidence as a reasonable mind might accept

14     as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).

15     Where "the evidence can support either outcome, the court may not substitute its judgment

16     for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016,

17     1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

18     Moreover, the court may not focus on an isolated piece of supporting evidence, rather it

19     must consider the entirety of the record weighing both evidence that supports as well as

20     that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations

21     omitted).

22

23     **III.    ANALYSIS**

24           *A.      The Five-Step Evaluation*

25           The Commissioner follows a five-step sequential evaluation process to assess

26     whether a claimant is disabled.   20 C.F.R. § 404.1520(a)(4).   This process is defined as

27     follows:  Step one asks is the claimant "doing substantial gainful activity[?]"  If yes, the

28     claimant is not disabled; step two considers if the claimant has a "severe medically

determinable physical or mental impairment[.]"  If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work.  If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience.  If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff had "not engaged in substantial gainful activity since April 23, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*)."  AR at 29.  At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: degenerative disc disease, obesity, cervical radiculopathy, hypertension, neuropathy and carpal tunnel syndrome.  (20 CFR 404.1520(c))."  *Id.*  The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  *Id.* at 30.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations:  Claimant can lift/carry 20 pounds occasionally and 10 pounds frequently[;] Claimant can sit, stand or walk for 6 hours each per 8 hour workday[;] Claimant can occasionally climb ladders/ropes/scaffolds/ramps/stairs, balance, stoop, kneel, crouch or crawl[;] [and] Claimant can frequently finger.  *Id.* at 31.  At step four, the ALJ found that "[t]he claimant is capable of performing past relevant work."  AR at 34.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.*

Plaintiff asserts that the ALJ committed error by "rejecting Dorsey's symptom testimony in the absence of specific, clear, and convincing reasons supported by substantial evidence in this record as a whole."  Opening Br. (Doc. 20) at 9.  Plaintiff further asserts

that the ALJ erred in "rejecting Dr. Morris's assessments with at least specific and legitimate reasons based on substantial evidence in this record." *Id.* at 13.

### B.    *Plaintiff's Symptoms*

Plaintiff asserts that "[t]he ALJ failed to meet the stringent test that requires specific, clear, and convincing reasons for rejecting claimants' [sic] symptom testimony." Opening Br. (Doc. 20) at 12.   Defendant counters that "[t]he ALJ articulated specific reasons for discounting Plaintiff's symptoms, complying with the regulations and SSR 16-3p." Response (Doc. 21) at 13.

### 1. Legal standard

An ALJ must engage in a two-step analysis to evaluate a claimant's subjective symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'"  *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).   Further, "the claimant need not show that h[is] impairment could reasonably be expected to cause the severity of the symptom []he has alleged; []he need only show that it could reasonably have caused some degree of the symptom."  *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).  "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'"  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282).  "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of h[is] symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law).  "While ALJs

obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

## **2. ALJ findings**

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 31. "After careful consideration of the evidence, the [ALJ] f[ound] that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" *Id.* The ALJ then found that "[t]he claimant's statements about the intensity, persistence, and limiting effects of these symptoms are not fully consistent with the medical evidence and other evidence in the record[.]" *Id.* at 32. The ALJ reviewed Plaintiff's orthopedic issues, first noting his 2011 lumbar decompression surgery due to spinal stenosis. *Id.* at 32. "[Plaintiff] was noted to have recovered well and required no pain medication." *Id.* Years later, Plaintiff began to experience cervical pain and hip pain. AR at 32. Scans revealed "mild degenerative changes throughout the cervical spine . . . [and] multilevel foramina[l] narrowing which [wa]s moderate to severe on the left at C3–C4." *Id.* Dr. Din "noted a generally normal physical examination, other than signs of loss of feeling in the lower extremity." *Id.* "[Plaintiff] was referred to Pima Pain Center in August 2015." *Id.* (citations omitted). "[Plaintiff] reported that his pain was managed with medication and reduced by about 20–40%." *Id.* (citations omitted). The ALJ observed that Plaintiff's physical examination was normal except for moderate pain with axial loading of his cervical spine, a positive Spurling's test, and positive facet loading. AR at 32. The ALJ noted that Plaintiff reported a 75% reduction in pain following cervical epidural steroid injections. *Id.* (citations omitted). The ALJ further noted that Plaintiff "indicated at his March 2016 visit with Pima Pain Center that his pain had greatly improved

and the amount of pain medication was just right." *Id.* (citations omitted).  The ALJ noted that Plaintiff "was diagnosed with lumbar spondylosis and lumbar radiculitis." *Id.* at 33. The ALJ further noted that after receiving a lumbar transforaminal epidural steroid injection, Plaintiff reported to Dr. Din that the injection helped his groin pain but not his hip pain. *Id.*  Plaintiff also "indicated he was waiting on approval for a nerve stimulator." AR at 33.  The ALJ observed that "Dr. Din found the claimant had a normal gait and was able to tandem walk and heel-toe walk normally[,] . . . [and] had normal tone and muscle strength in all extremities, but had decreased sensation to soft touch and pin prick." *Id.*

The ALJ also noted that the "results of an EMG/NCV reflect[ed] that the claimant suffers from bilateral carpal tunnel syndrome." *Id.* (citations omitted).  The ALJ observed that Plaintiff "reported that bracing seemed to worsen his pain and hand gloves seemed to work better, although he indicated he still had numbness." *Id.*  The ALJ further observed that Plaintiff "was found to have decreased sensation to soft touch, pin prick, temperature, vibration and proprioception throughout[;] . . . [h]owever[,] he had normal results on fast finger and rapid alternating movements." *Id.* (citations omitted).  The ALJ noted that "Dr. Din charted in March 2016 that the claimant received shots in his wrists that had helped with the pain." AR at 33 (citations omitted).  The ALJ also noted that Plaintiff consistently rejected seeing a hand surgeon or any carpal tunnel release surgery. *Id.* (citations omitted).

### 3. Analysis

"[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir. 2007) (citations omitted).  Here, Plaintiff declined surgical intervention for his carpal tunnel syndrome — Brian P. Callahan, M.D., one of Plaintiff's treating physicians, observed that Plaintiff's MRI did not show any significant nerve root compression and that carpal tunnel syndrome was the source of Plaintiff's upper extremity pain symptoms. *See, e.g.,* AR at 792, 806, 927, 936, 978.  Plaintiff also reported that the cervical epidural steroid injections afforded greater than 75% relief of pain. *See id.* at 33, 855, 917, 994, 1086. "Impairments that can be controlled effectively with medication are not disabling[.]"

1    *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citations

2    omitted).  Additionally, the ALJ noted that Plaintiff also reported that he was waiting on

3    approval for a nerve stimulator to treat his low back pain, and at the same appointment Dr.

4    Din reported normal gait and muscle strength in Plaintiff's lower extremities.  *See id*. at

5    33.  The Court finds that the ALJ's symptom "finding is supported by substantial evidence

6    in the record, [and as such,] we may not engage in second-guessing." *Thomas v. Barnhart*,

7    278 F.3d 947, 959 (9th Cir. 2002) (citations omitted).

8               **C.     Treating Physician Testimony**

9           Plaintiff asserts that "the ALJ incorrectly assumed that Dr. Morris was *only*

10    evaluating Dorsey's mental condition, and therefore Dr. Morris's evaluations did not apply

11    to Dorsey's overall inability to work and were also directly opposed to opinions completed

12    only about Dorsey's mental health conditions." Pl's Opening Br. (Doc. 20) at 15.  Plaintiff

13    further argues that "[t]he ALJ incorrectly compared Dr. Morris's assessments to the

14    opinion from the consultative examiner who provided a limited opinion of Dorsey's mental

15    health[,] [so] [t]here is no necessary contradiction between Dr. Morris's assessment and

16    Dr. Yost's report, because Dr. Morris was assessing the overall effects of Dorsey's medical

17    conditions while Dr. Yost was reporting findings from a psychiatric consultative

18    examination." *Id*. at 20 (citations omitted).  Defendant urges that "[t]he ALJ provided

19    multiple valid reasons, supported by substantial evidence of record, for according no

20    weight to Dr. Morris's statements about Plaintiff's mental impairments.  Response (Doc.

21    21) at 17.

22           "As a general rule, more weight should be given to the opinion of a treating source

23    than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d

24    821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see*

25    *also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  "The opinion of a treating

26    physician is given deference because 'he is employed to cure and has a greater opportunity

27    to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169

28    F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir.

1987) (citations omitted)).  "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)) (citations omitted)).  Similarly, "[a] physician's opinion can be discredited based on contradictions between the opinion and the physician's own notes." *Buck v. Berryhill*, 869 F.3d 1040, 1050 (9th Cir. 2017) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)).  "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. § 404.1527(c)(4).

The ALJ summarized the facts, opinions and medical evidence in this case.  AR at 29–34.  The ALJ indicated that "[n]o weight [wa]s given to the multiple source statements from Dr. Gerald Morris that the claimant has moderate to marked mental limitations due to depression/anxiety. *Id.* at 34.  In support of this position, the ALJ reviewed Dr. Yost's 2014 and CODAC NP Rosin's 2016 opinions that Plaintiff "had a GAF of between 71-80" and their findings of "a generally normal mental health examination." *Id.*  The ALJ also pointed to Dr. Morris's own "treatment notes that document[ed] grossly normal short and long term memory, normal affect and good eye contact." *Id.* (citing Exh. 11F at 6, 13, 20, 25).  The ALJ further noted that she found Dr. Morris's opinion less persuasive when compared to the findings and opinions of mental health professionals, because he is not a mental health treatment provider. *Id.*

1    The ALJ's findings are consistent with the medical records in this case.  Dr. Morris's

2   opinion contradicted his own notes and other treatment records.  *See Buck v. Berryhill*, 869

3   F.3d 1040, 1050 (9th Cir. 2017) (citing *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir.

4   2005)).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

5   testimony, and for resolving ambiguities."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

6   Cir. 1995) (citations omitted).   The ALJ provided "'specific and legitimate reasons'

7   supported by substantial evidence in the record" to reject Dr. Morris's opinions regarding

8   Plaintiff's mental limitations.  *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).

9   Accordingly, she did not err.

10

11  **IV.    CONCLUSION**

12    Based upon the foregoing, the Court affirms the ALJ's decision.  Accordingly, IT

13  IS HEREBY ORDERED that:

14       1)    Plaintiff's Opening Brief (Doc. 20) is DENIED;

15       2)    The Commissioner's decision is AFFIRMED; and

16       3)    The Clerk of the Court shall enter judgment and close its file in this case.

17

18    Dated this 19th day of January, 2021.

19

20    _____
       Bruce G. Macdonald
21     United States Magistrate Judge